UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CINDY W.,                              )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      No.  4:18 CV 603 JMB
                                       )
                                       )
ANDREW M. SAUL,                        )
Commissioner of Social                 )
Security Administration,               )
                                       )
            Defendant.                 )

## MEMORANDUM AND ORDER

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, *et seq.* ("the Act").  The Act authorizes judicial review of the final decision of the Social Security Administration denying Plaintiff Cindy W.'s ("Plaintiff") application for disability benefits under Title II of the Social Security Act,  see 42 U.S.C. §§ 401 et seq.  All matters are pending before the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c).  Substantial evidence supports the Commissioner's decision, and therefore it is affirmed.  See 42 U.S.C. § 405(g).

## I.      Procedural History

On December 14, 2015, Plaintiff filed an application for disability benefits, arguing that her disability began on February 1, 2015,[1] as a result of bipolar disorder, depression, anxiety, total knee replacement, high blood pressure, high cholesterol, underactive thyroid, insomnia, sleep apnea, and neuropathy.  (Tr. 91, 168-71, 191)  Plaintiff's date of last insured is December

---

[1] Plaintiff initially alleged on onset date of September 30, 2015.  On October 3, 2017, Plaintiff's attorney amended Plaintiff's onset date of disability to February 1, 2015.  (Tr. 191)

31, 2019.  (Tr.192)  On April 4, 2016, Plaintiff's claims were denied upon initial consideration.  (Tr. 91-95)  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  Plaintiff appeared at the hearing (with counsel) on October 3, 2017, and testified concerning the nature of her disability, her functional limitations, and her past work.  (Tr. 28-74)  The ALJ also heard testimony from Debra Determan, a vocational expert ("VE").  (Tr. 65-74, 316-18)  The VE opined as to Plaintiff's ability to perform her past relevant work and to secure other work in the national economy, based upon Plaintiff's functional limitations, age, and education.  (Id.)  After taking Plaintiff's testimony, considering the VE's testimony, and reviewing the rest of the evidence of record, the ALJ issued a decision on December 1, 2017, finding that Plaintiff was not disabled, and therefore denying benefits.  (Tr. 8-22)

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration ("SSA").  (Tr. 1-5)  On February 13, 2018, the Appeals Council denied review of Plaintiff's claims, making the December 1, 2017, decision of the ALJ the final decision of the Commissioner.  Plaintiff has therefore exhausted her administrative remedies, and her appeal is properly before this Court.  See 42 U.S.C. § 405(g).

In her brief to this Court, Plaintiff raises five related issues.  First, Plaintiff argues that the ALJ erred by giving partial weight to the opinions of Dr. Mattingly regarding her mental impairments.  Plaintiff also challenges the ALJ's evaluation of her subjective complaints.  Plaintiff argues that the ALJ erred by not finding her migraine headaches to be a severe impairment.  Next, Plaintiff challenges the ALJ's determination that she retained the Residual Functional Capacity ("RFC") to perform light work.  Lastly, Plaintiff requests that if the Court remands this case for further proceedings, the case be assigned to a different ALJ.  Because the Court finds that remand is not appropriate, it does address the allegations of ALJ bias.  The

Commissioner filed a detailed brief in opposition. In her Reply brief, Plaintiff raises for the first time an additional argument regarding the weight accorded to Dr. Sturm's PMSS.

As explained below, the Court has considered the entire record in this matter. Because the decision of the Commissioner is supported by substantial evidence, it will be affirmed.

## II.    <u>Medical Records</u>

The administrative record before this Court includes medical records concerning Plaintiff's health treatment from September 26, 2013, through September 28, 2017. The Court has reviewed the entire record. The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

### A.    <u>Mid County Orthopedics – Dr. Jason Rabenold</u> (Tr. 367-93, 412-20, 428-36, 443-77)

On February 16, 2015, Dr. Jason Rabenold  treated Plaintiff for a right shoulder cuff tear. Plaintiff reported pain and difficulty with her daily activities and working as a school bus driver. After finding conservative treatment, including injections, therapy, anti-inflammatories, and activity modification, had not alleviated Plaintiff's pain, Dr. Rabenold performed surgery.

On March 3, 2015, Dr. Rabenold performed right shoulder arthroscopy with rotator cuff repair and debridement surgery. In post-surgery follow up on March 9, 2015, Plaintiff reported that her pain was under control and she was exercising. Dr. Rabenold ordered physical therapy. Plaintiff indicated that she had lost her job so she would no longer have insurance as of April 1, 2015. Dr. Rabenold contacted Advanced Physical Therapy about a payment plan for Plaintiff. Plaintiff returned on April 6, 2015, and reported doing well and doing her physical therapy exercises. In follow-up treatment on May 18, 2015, Plaintiff reported her pain being under control and completing her home exercises. Dr. Rabenold continued Plaintiff's physical therapy treatment to improve her strengthening and conditioning.

3

On September 17, 2015, Advanced Training and Rehab discharged Plaintiff and noted that Plaintiff had met 100% of her goals and achieved the maximum benefit of therapy.

**B.**     **St. Charles Psychiatric Associates – Dr. Gregory Mattingly** (Tr. 360-62, 395-402, 886-92)

Between September 26, 2013, and April 6, 2017, Dr. Gregory Mattingly treated Plaintiff's bipolar disorder and attention deficit hyperactivity disorder ("ADHD"). Many of Dr. Mattingly's treatment notes tend to be illegible.

On September 26, 2013, Dr. Mattingly's mental status examination showed Plaintiff was active, alert and oriented in person, time and place ("AAOX3"), with no suicidal or homicidal ideations. During treatment on January 28, 2014, Dr. Mattingly noted that Plaintiff's therapy goals included finding life balance and addressing stress and money management. Plaintiff reported that she had two minor school bus accidents so far this year. Mental status examination showed Plaintiff was AAOX3, with no suicidal or homicidal ideations, and decreased focus.

On May 16, 2014, Plaintiff reported that she had moved in with her father because of issues with her son. Dr. Mattingly noted the same mental status examination findings. On September 19, 2014, Plaintiff reported that she had moved back home after telling her husband to deal with her son. Mental status examination showed Plaintiff was AAOX3, with no suicidal or homicidal ideations or hallucinations, and fair judgment/insight. The November 10, 2014, mental status examination showed the same mental status findings.

On February 18, 2015, Plaintiff reported being very depressed and having problems at work and at home with her son. Mental status examination showed Plaintiff was AAOX3, with no suicidal or homicidal ideations or hallucinations, and fair judgment/insight. Dr. Mattingly increased Plaintiff's Latuda dosage. Dr. Mattingly also completed a form for medical leave under the Family Medical Leave Act ("FMLA"). In the FMLA form, Dr. Mattingly indicated

that Plaintiff's recurrent bipolar depression episode started on February 1, 2015, with a probable duration of two months, and prevented her from performing job functions such as focus and concentration.  Dr. Mattingly also indicated that Plaintiff's mental impairment would cause flare-ups that would prevent Plaintiff from working one day every two months.  On February 26, 2015, Plaintiff reported being fired from her job.  Dr. Mattingly adjusted Plaintiff's medication regimen.  During treatment on March 12, 2015, Plaintiff reported that she was having problems at home with her son and problems after being fired.  Dr. Mattingly noted the same mental status examination findings.  Dr. Mattingly adjusted her medication regimen.

On January 26, 2016, Plaintiff reported that she "filed for disability for other problems" and being in a car accident.  (Tr. 890)  Mental status examination showed AAOX3, no suicidal or homicidal ideations or hallucinations, and fair judgment/insight.  Dr. Mattingly refilled her medication regimen.  Plaintiff returned on June 22, 2016, and Dr. Mattingly continued her medication regimen.  Dr. Mattingly noted the same mental status examination findings.  On August 15, 2016, Plaintiff reported being in a lot of physical pain and feeling down.  Dr. Mattingly noted the same mental status examination findings.  Dr. Mattingly adjusted Plaintiff's medication regimen.  On October 3, 2016, Plaintiff reported continued stress caused by her son and having a restraining order against him and considering moving to Sikeston to live with her niece.  Mental status examination showed Plaintiff was AAOX3, moderately stressed with no suicidal or homicidal ideations and fair judgment/insight.  Dr. Mattingly continued Plaintiff's medication regimen,

On January 3, 2017, Plaintiff reported that her son was living at his girlfriend's house and Plaintiff had a restraining order against him.  Dr. Mattingly noted the same mental status examination findings.  In treatment on April 18, 2017, Plaintiff reported continued family

conflicts.  Mental status examination showed Plaintiff was AAOX3, with no suicidal or homicidal ideations, improved mood, and fair judgment/insight.

### C.  **CenterPointe Hospital** (Tr. 928-81)

On May 9, 2016, Plaintiff presented for general medical management at CenterPointe Hospital and reported having a suicide plan.  Dr. Mattingly admitted Plaintiff for treatment for her active thoughts of suicide and crisis stabilization and placed her on suicide precautions.  Dr. Mattingly noted that Plaintiff's prior psychiatric history included office treatment and hospital-based treatment and that Plaintiff "has been  under a great deal of stress in taking care of a father who is medically ill, [and] her son who has bipolar disorder and substance abuse."  (Tr. 980)  Mental status examination showed Plaintiff's mood was down, her affect constricted, her speech slowed, and she had limited judgment and insight with an average overall level of intellect.

At the time of discharge on May 17, 2016, Dr. Richard Anderson noted that Plaintiff had received adjustments to her medications, and Plaintiff had attended group and social worker counseling.  Dr. Anderson noted that Plaintiff was no longer suicidal or psychotic, and her judgment, insight, and mood had improved.

On May 19, 2016, Plaintiff presented for an outpatient psych evaluation and for stabilization.  Plaintiff reported being unemployed and taking care of her demanding father and being overwhelmed by her environment.  Plaintiff denied any suicidal ideations or impulsivity but she had anxiety and was unable to accomplish tasks.  Dr. Roomana Arain's mental examination showed Plaintiff's thought processes to be logical and goal directed, her mood to be depressed, her orientation intact x4, her memory intact, her judgment moderately impaired, and her attention/concentration were distracted.  Dr. Arain admitted Plaintiff for stabilization and therapeutic treatment and continued her medication regimen.  In the discharge summary, Plaintiff

noted that she had regained the stress of her home life, including being financially strained with some concern of having to file bankruptcy. Plaintiff reported that being the care taker of her alcoholic and verbally abusive father had put her over the edge and that she was no longer taking care of him. Plaintiff reported symptoms including irritability, poor concentration and motivation, anxiety, sadness, feeling of loss, low self-esteem, increased anger and appetite, and decreased daily activities. Plaintiff listed her stressors included taking care of her father, finances, chronic pain, conflict with her spouse, son's polysubstance abuse, and denial of Social Security benefits. Dr. Arain diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder. Dr. Arain noted that Plaintiff was motivated for and cooperative with treatment.

On June 3, 2016, Plaintiff was readmitted to the inpatient program because she reported feeling suicidal again and for evaluation and treatment for her problems with bipolar disorder and depression. Plaintiff listed her medically ill father, her son's bipolar disorder and behavior, and her difficult relationship with her unsupportive husband as her stressors. Mental status examination showed Plaintiff to be alert and oriented x3, depressed mood, constricted affect, limited judgment and insight, and positive thoughts of suicide. Dr. Anderson increased her dosage of medications and directed Plaintiff to participate in the therapy. In the discharge summary, Dr. Mattingly noted that Plaintiff's medication regimen had been adjusted while in the hospital, and her depressive symptoms and suicidal ideations had gradually improved. Her diagnoses were major depressive disorder, generalized anxiety disorder, and ADHD. Plaintiff's discharge follow-up included scheduling an appointment with Dr. Mattingly and transcranial magnetic stimulation treatment ("TMS").[2]

---

[2] TMS uses a magnet to activate the brain as treatment for major depression for patients who do

Between June 13 and July 15, 2016, Plaintiff received frequent outpatient TMS treatment. During treatment, Plaintiff noted that her main stressor was her son who had been kicked out of the house by her husband. Plaintiff questioned whether she was depressed or worried about her family situation. Plaintiff did not report any side effects from the TMS treatment. Plaintiff reported 100% improvement for her depression with no crying episodes and feeling like she can handle situations. On June 27, 2016, Plaintiff reported that she felt like she had almost made "a complete turn around." (Tr. 949) Plaintiff also reported being excited for the future "for the first time in forever," communicating better with her family, and enjoying life. During treatment on July 1, 2106, Plaintiff reported completing tasks around the house and socializing with friends and family and denied having any depression or anxiety. The treatment notes showed that Plaintiff had experienced improvement in her energy, motivation, depression, anxiety, and communications with her family. Plaintiff reported feeling the best she had felt in years. After her last TMS treatment, the therapist noted that Plaintiff would continue follow-up treatment with Dr. Mattingly.

Between March 8 and March 20, 2017, Plaintiff received daily, outpatient TMS treatment. Plaintiff reported being estranged from her son and interested in pursuing volunteer opportunities. Plaintiff reported looking for a part time job and being in an unhealthy relationship with her husband. Plaintiff reported no negative side effects from the TMS treatment and the treatment really helped her symptoms.

D.    **Mercy Clinic Pulmonology – Dr. Michael Brischetto** (Tr.486-92, 894-924)

On November 11, 2015, Dr. Michael Brischetto evaluated Plaintiff for possible sleep

---

not respond to at least one antidepressant medication in the current episode. Brain Stimulation Therapies (National Institute of Mental Health), https://www.nih/gov/.../brain-stimulation-therapies.shmtl

apnea and noted in his impression, sleep onset insomnia due to anxiety, anxiety, depression, and snoring. Dr. Brischetto recommended doing a sleep study and adjusted Plaintiff's medication regimen. Plaintiff reported stress from having her son live with her but her stress level had improved since her son was in treatment at a rehab facility. Examination showed no back, neck, or joint pain. Plaintiff indicated that she has problems due to her finances, husband, and son. Dr. Brischetto observed that Plaintiff had a normal gait.

A December 11, 2015, sleep study showed mild-to-moderate obstructive sleep apnea, and the doctor recommended that Plaintiff return for CPAP titration.

On August 19, 2016, Plaintiff reported being under a lot of stress from caring for her alcoholic father, placing her son in rehab, and being fired. Dr. Brischetto directed Plaintiff to continue using a CPAP and to exercise three to four hours prior to bed time.

In follow-up treatment for sleep apnea and insomnia on January 16, 2017, Plaintiff indicated that she had filed for disability due to her bipolar disorder. Plaintiff reported spending a lot of time in bed playing on her computer or watching television.

**E.** **SSM Health St. Joseph Lake St. Louis** (Tr. 497-544)

On December 22, 2105, Plaintiff presented in the emergency room at SSM Health St. Joseph for treatment for a sternal fracture caused by a car accident. Plaintiff reported having knee and back pain. A MRI of Plaintiff's cervical spine showed no fracture and minor degenerative changes. The MRI of Plaintiff's cervical and lumbar spine was normal, and a bilateral knee x-ray was normal.

**F.** **Mercy Services O'Fallon Family Medicine – Dr. Alyssa Keller** (Tr. 552-700, 726-846)

Dr. Alyssa Keller treated Plaintiff between December 16, 2014, and April 24, 2017.

On December 16, 2014, Dr. Keller diagnosed Plaintiff with bronchitis. Plaintiff's

Problem List included the notation, "mgrn with aura wo ntrc mgrn" with treatment from March 24, 2006, though January 17, 2011, with Dr. Thomas Sommers. Plaintiff reported having weekly migraine headaches with relpax providing relief. On February 23, 2015, Plaintiff returned for a preoperative examination and released Plaintiff for surgery. In follow-up treatment on April 13, 2015, Plaintiff reported having back pain and a rash. Plaintiff also reported crying spells and stress caused by her son's recent suicide attempt and being terminated from school bus driver job. Plaintiff indicated that Dr. Mattingly prescribed lithium for her psychiatric care, and she felt lithium and prozac helped her.

On May 16, 2015, Plaintiff returned, complaining of back and abdominal pain. Dr. Keller noted that Plaintiff's blood pressure was well controlled on her current medication. Plaintiff returned on May 20, 2015, for a routine general medical examination with no complaints on review. Plaintiff reported previously using relpax for intermittent headaches with good relief, but she stopped taking relpax because it was not covered by her insurance. Plaintiff denied having any current headaches. Plaintiff reported starting a progressive daily aerobic exercise program and following a low-fat diet to lose weight.

On June 23, 2015, Dr. Keller noted that Plaintiff's blood pressure was within a normal range. In follow-up treatment on August 26, 2015, Plaintiff received treatment for shingles and reported being under a great deal of stress caused by her family situation. Plaintiff explained that her son had been abusing multiple drugs and was recently released from a psychiatric unit.

During treatment on December 1, 2015, Plaintiff returned for a medication review. Plaintiff indicated that she was applying for a new job as a driver for a packaging company and requested Dr. Keller complete the necessary paperwork. Plaintiff reported that she had a restraining order against her son because of his violent behavior and denied having any suicidal

ideation or homicidal ideation. Dr. Keller observed Plaintiff had a normal gait and normal strength. Dr. Keller completed Plaintiff's paperwork for her new employer and explained how her new depression medication prescribed in the emergency room might have side effects including suicidal ideations. Plaintiff returned on December 8, 2015, to discuss restarting her psychiatric medications. Plaintiff explained that she thought she could get off some of her medications so that she could start a new job but her bipolar episodes interrupt her sleep. Dr. Keller referred Plaintiff back to Dr. Mattingly for psychiatric treatment. On December 16, 2015, Plaintiff reported "a history of bipolar disorder managed by psychiatry (Dr. Mattingly) on Latuda, adderall XR, and prozac." (Tr. 665) Plaintiff requested evaluation for burning discomfort in her feet with some numbness. In her assessment, Dr. Keller listed neuropathy and referred Plaintiff for nerve conduction testing. Plaintiff returned on December 29, 2015, for treatment after a car accident. Plaintiff reported lower back and left knee pain, severe chest pain, abdominal pain, and no severe headaches or loss of balance. An x-ray of Plaintiff's ribs showed a fracture of her fifth and sixth right lateral ribs. Dr. Keller instructed Plaintiff to rest, to apply ice as needed, and to use extra-strength Tylenol. A nerve conduction study of Plaintiff's bilateral lower extremities showed no denervation in the distal muscles on either side.

Plaintiff returned on February 24, 2016, for follow-up treatment after a car accident. Plaintiff reported that her knee pain had improved and requested a referral for physical therapy for her back pain. On March 15, 2016, Plaintiff presented with radiating lower back pain. Examination of Plaintiff's back showed a normal range of motion and no tenderness. In treatment on March 28, 2016, Plaintiff reported that she had been seeing an orthopedic doctor and completed four weeks of physical therapy relieving her symptoms with overall improvement. Dr. Keller approved Plaintiff for medical clearance.

Plaintiff returned on August 4, 2016, and reported feeling well with no complaints. Dr. Keller directed Plaintiff to begin a progressive daily aerobic exercise program and reduce exposure to stress. On September 27, 2016, Plaintiff reported abdominal pain possibly caused by the multiple medications she takes.

In follow-up treatment on March 3, 2017, Plaintiff reported ongoing problems with bilateral ankle pain and swelling, a history of plantar fasciitis, and neuropathy in her feet. On April 24, 2017, Plaintiff reported left hip joint pain, swelling of right middle finger, hypertension, and bilateral swelling of her feet and ankles. Dr. Keller provided home exercises for her hip pain and continued her hypertension medication.

### G. **Dr. David Lipsitz** (Tr. 706-10)

On March 25, 2016, Dr. David Lipsitz, Ph.D., completed a psychological consultation after reviewing Plaintiff's medical records. Dr. Lipsitz observed that Plaintiff exhibited no difficulty with her posture or gait, and she drove herself to the consultation. As her chief complaint, Plaintiff stated that she drove a school bus for over seven years, and her bipolar disorder resulted in her not being able to deal with students so the school district fired her. Plaintiff reported a thirty-year history of psychiatric treatment. Plaintiff indicated that Dr. Mattingly diagnosed her with bipolar disorder ten years earlier. Plaintiff reported being depressed but her energy level is good. Dr. Mattingly also diagnosed Plaintiff with ADHD. Plaintiff reported "spending a lot of time taking care of her father" usually half the week Plaintiff goes to shows and plays poker once a week. Plaintiff spends most of her time playing computer games, taking care of her father, doing some housework, and preparing meals. Plaintiff indicated that she had a lot of stress caused by her son resulting in financial stress. Mental status examination showed no active psychotic functioning, depressed mood, intellectual

functioning within the average range, good concentration, fair insight and judgment, and preoccupied thought processes with physical and emotional problems. Dr. Lipsitz found that Plaintiff did not have any impairment in concentration, but due to volatility factors, anxiety, and depression, Plaintiff had difficulty persisting with tasks and a somewhat slow pace.

### H. **Mercy Orthopedic Clinic – Dr. Keith Odegard** (Tr. 847-82)

On February 22, 2016, Plaintiff presented for evaluation of her left ankle by Dr. Keith Odegard. Plaintiff reported that she does housework and cares for her father. Plaintiff denied any recent history of anxiety or depression. Dr. Odegard observed that Plaintiff walks with a very slow and short stride gait and she can heel and toe walk. Examination showed her motor strength to be 5/5 in all directions, and her ankle stability was normal. An x-ray of Plaintiff's left ankle showed minimal degenerative change. Dr. Odegard opined that Plaintiff had a right ankle sprain with possible peroneal tendinitis and recommended a course of physical therapy to help with her range of motion, strengthening, balance, and gait. In follow-up treatment on March 23, 2016, Plaintiff reported that physical therapy had helped and improved her strength. Plaintiff denied having any symptoms or limitation in activity. Dr. Odegard found Plaintiff's ankle strain had resolved, and he recommended that Plaintiff continue to increase her activities and work on her proprioception exercises.

### I. **Foot Healer Holdings – Dr. Magdala Lafontant** (Tr. 982-1046)

Between August 24, 2016, and April 17, 2017, Dr. Magdala Lafontant, a doctor of podiatric medicine, treated Plaintiff's foot and ankle pain. Dr. Lafontant diagnosed Plaintiff with degenerative joint disease of her ankle and foot, plantar fasciitis, and Achilles bursitis.

During treatment on August 24, 2016, Dr. Lafontant recommended that Plaintiff wear more supportive shoes and inserts and perform stretching and strengthening exercises, On

September 22, 2016, Plaintiff reported improvement in her pain and being more active. Dr. Lafontant administered cortisone injections. Plaintiff returned on October 17 and November 14, 2016, and reported generalized foot and ankle pain. Plaintiff experienced relief from ice, walking, elevation, and cortisone shot. Dr. Lafontant opined that Plaintiff's main problem is neuritis and instructed Plaintiff to return on December 27, 2016.

Plaintiff returned on March 1, 2017, and reported continued foot pain symptomatic due to stress in her life. On April 17, 2017, Plaintiff reported having stress caused by her son, home issues, and finances. Plaintiff reported significant improvement since being prescribed new psychiatric medications.

### J. **Dr. Kevin Rutz** (Tr. 1031-1046)

On January 21, 2016, and June 27, 2017, Dr. Kevin Rutz treated Plaintiff's spine pain. In a Spine Questionnaire, Plaintiff noted that her back pain started on December 22, 2016, after a car accident. Dr. Rutz noted that Plaintiff was wearing a back brace.

### K. **Arch Advanced Pain Management – Dr. James Sturm** (Tr. 1049-1101)[3]

From April 26 through September 28, 2017, Dr. James Sturm treated Plaintiff six times for feet and lower back pain and bursitis in her left hip. Plaintiff reported that she started experiencing sudden onset of pain in February, 2017, and she used a cane as an assistive device.[4] Dr. Sturm diagnosed Plaintiff with degenerative disc disease and failed back syndrome. Dr. Sturm administered an injection and fitted Plaintiff with a back brace. During treatment, Plaintiff indicated that the pain medications allowed her to remain functional, and she denied

---

[3] In a letter to Plaintiff's counsel, an employee of Arch Advanced Pain Management explained that "Dr. Sturm uses running notes. This means that the last office visit note contains everything from the first visit to the last visit the patient was seen." (Tr. 1048)

[4] Nowhere in the record does it suggest that a cane was ever prescribed by any healthcare provider.

having any side effects from her pain medications. On August 15, 2017, Plaintiff returned to have her disability paperwork completed by Dr. Sturm. Examination on September 28, 2017 showed Plaintiff had a stiff spine with severe tenderness to palpation, full and normal motor strength, and a normal gait. Dr. Sturm indicated that he did not think Plaintiff required additional surgery. Dr. Sturm found Plaintiff had a normal mental status with good concentration and attention span.

A CT of Plaintiff's lumbar spine showed mild levoscoliosis, slight anterolisthesis of L5 on S1, mild central disc bulging at L2-3, and mild diffuse spondylosis at L3-4. An MRI of Plaintiff's lumbar spine showed mil levoscoliosis of the lumbar spine, a slight anterolisthesis of L5on S1, and postoperative changes at L5-S1.

## III.   **Opinion Evidence**

### A.   **Dr. James Sturm**   (Tr. 711-16)

On August 15, 2017, Dr. Sturm completed a Physical Medical Source Statement ("PMSS"). Dr. Sturm started treating Plaintiff on April 26, 2017, and his diagnoses included lumbar radiculopathy, osteoarthritis, total bilateral knee replacement, and failed back syndrome. Dr. Sturm opined that prolonged ambulation would trigger pain and prolonged working at a computer would make Plaintiff's right hand go numb. In support, Dr. Sturm cited an MRI of Plaintiff's lumbar spine showing mild disc bulging and changes at L-5. In an eight-hour workday, Dr. Sturm found that Plaintiff could sit and stand/walk for less than two hours. Dr. Sturm opined that Plaintiff would need to shift positions and would need to walk every 30 minutes for 15 minutes. Plaintiff would also need to take unscheduled breaks every day for at least 15 minutes. With prolonged sitting, Plaintiff would need to elevate her legs 45 degrees. Dr. Sturm found that Plaintiff would be off task 25% or more each workday. Dr. Sturm

indicated that Plaintiff had blurred vision and changes in the weather caused Plaintiff increased pain.

**B.** **Dr. Gregory Mattingly** (Tr. 717-23)

On May 12, 2016, Dr. Mattingly completed a Mental Medical Source Statement ("MMSS"). Dr. Mattingly listed bipolar disorder, depression, family stress, migraines, and hypertension as Plaintiff's medical impairments and five years as his length of treatment.[5] Dr. Mattingly noted that his clinical findings showed Plaintiff to be severely depressed with suicidal ideation and to have low energy and poor concentration. Dr. Mattingly endorsed ten symptoms, including decreased energy; appetite disturbance; impaired impulse control; disturbance of mood; thoughts of suicide; difficulty thinking or concentrating; psychological or behavioral abnormalities; bipolar syndrome; and easy distractibility. In an assessment of Plaintiff's work-related mental abilities and aptitudes,[6] Dr. Mattingly stated that Plaintiff was "seriously limited" in nearly all categories including her abilities to understand and remember very short and simple instructions and "limited but satisfactory" in her ability to carry out short and simple instructions and to ask simple questions or request assistance needed to do unskilled and semiskilled work. Dr. Mattingly further noted that work demands such as speed, precision, deadlines, making decisions, completing tasks, and being criticized by supervisors would be stressful for Plaintiff. Dr. Mattingly found that if Plaintiff was working, she would be absent from work 4 days per

[5] Although Dr. Mattingly indicated that he had been treating Plaintiff for five years, his first treatment record is dated September 26, 2013.

[6] The MMSS asked Dr. Mattingly to rate Plaintiff's abilities in several domains on a scale of "unlimited or very good," "limited but satisfactory," "seriously limited," "unable to meet competitive standards," and "no useful ability to function." "Seriously limited" was defined as "noticeable difficulty (e.g. distracted from job activity) from 11 to 20 percent of the workday or work week." "Unable to meet competitive standards" was defined as "noticeable difficulty (e.g. distracted from job activity) from 21 to 49 percent of the workday or work week." None of the domains were marked "unable to meet competitive standards."

month.  Dr. Mattingly opined that Plaintiff's impairments, as demonstrated by clinical findings, are reasonably consistent with the functional limitations set forth in this statement.

## IV.     Forms Completed by Plaintiff and Phillip Wicks

In a Function Report-Adult, Plaintiff stated that she cooks easy meals, does light cleaning/laundry, and goes grocery shopping every other week for thirty to forty-five minutes. (Tr. 238-45)  Plaintiff reported that she no longer attends many of her niece's sporting events. Plaintiff indicated that she can use a computer for thirty to sixty minutes at one sitting.

In a Work History Report, Plaintiff reported returning to work for four months as a bus driver for a different school district and then working for a month at Walgreens.

In a Function Report Adult – Third Party, Phillip Wicks, Plaintiff's husband, indicated that he helps his wife take care of the house, and Plaintiff also works on painting craft projects and making blankets.  Mr. Wicks explained that Plaintiff takes care of her father.  Mr. Wicks indicated that Plaintiff had been fired from both of her school bus driver jobs.

## V.      The Hearing Before the ALJ (Tr. 28-74)

The ALJ conducted a hearing on October 3, 2017.  Plaintiff was present with an attorney and testified at the hearing.  The VE also testified at the hearing.  At the beginning of the hearing the ALJ explained that Plaintiff could get up and move around if she needed.

### A.     Plaintiff's Testimony

Plaintiff began her testimony by noting that she lives in a house with her husband and her son.  (Tr. 36)

Plaintiff testified that she can no longer work after having a nervous breakdown while working as school bus driver.  She explained that she could not emotionally handle 70 students on a bus without a monitor.

Plaintiff has been treated by a psychiatrist for five years. Plaintiff admitted herself to CenrterPointe Hospital and has received two TMS treatments. Plaintiff testified that the TMS treatments were helpful. In May 2016, Plaintiff decided to seek treatment at CenterPointe Hospital. Plaintiff testified that she sees a counselor in Dr. Mattingly's office every two weeks. (Tr. 52)

After having back surgery in 2015, Plaintiff had some relief from her back pain, but the pain returned. After having two total knee replacements, Plaintiff has had problems knee swelling. (Tr. 56) Plaintiff testified that she had bilateral carpal tunnel syndrome release surgery. (Tr. 64) After a car accident in December 2015, Plaintiff's ankles started to bother her. (Tr. 57) Plaintiff testified that at the time of the accident, she was driving to a movie theater to meet a girlfriend. (Tr. 58)

Plaintiff testified that she has problems taking care of her personal needs because she has difficulty bending over due to her bursitis in her back and difficulty holding a blow dryer due to her pain in her upper right shoulder. Plaintiff has had shots in both shoulders, the last one a year earlier. Plaintiff wears inserts and booties for her plantar fasciitis. Plaintiff testified that she has swelling in her feet and legs.

Plaintiff testified that since she stopped working, her husband helps with the household chores and does the grocery shopping. (Tr. 50) Before moving out of their house, Plaintiff attended Al-Anon meetings. Plaintiff testified that she could lift 15 pounds, and she could stand for thirty minutes. (Tr. 56) Sitting causes her joints to become stiff. Plaintiff testified that she could alternate standing and sitting for a couple of hours and then she would have to lie down for thirty minutes. When Plaintiff cared for her father, she served as a companion and fixed simple meals and went to the grocery store, but she stopped taking care of her father because of his

verbal abuse.  (Tr. 61)

In late 2015, Plaintiff worked at Walgreens for three weeks but she left the job because she could not handle the emotional stress or the physical duties of the job.  (Tr. 59)

### B.    The VE's Testimony

The VE indicated that Plaintiff's past work included jobs such as a school bus driver but that Plaintiff could not perform her past relevant work as a school bus driver.  (Tr. 69)

The ALJ asked the VE a series of hypothetical questions to determine whether someone Plaintiff's age, education, work experience, and specific functional limitations would be able to find a job in the local or national economy.  (Tr. 70)  First, the ALJ asked the VE to assume a hypothetical individual limited to light work but who could stand and/or walk about six out of eight hours and could sit about six hours with normal breaks.  The ALJ also asked the VE to assume that this hypothetical individual could occasionally climb ramp and stairs but never climb ladders, ropes, or scaffolds; occasionally stoop and crouch; never kneel or crawl; should avoid working above shoulder level with her right shoulder; and would be limited to simple and/or repetitive type work not requiring close interaction with the public only incidental contact with the public.  The ALJ indicated that the hypothetical individual could perform jobs such as a marking clerk and a photocopy machine operator.  (Tr. 70)

The ALJ next asked the VE to assume the same hypothetical individual except the individual would consistently miss two or more days per month, and whether such individual could perform the work outlined in her earlier response.  (Tr. 71)  The VE responded such individual could not perform the jobs cited.  The VE also opined that if the hypothetical individual is off task at least 15% of the day or more, this would preclude competitive employment.  (Tr. 72)

Plaintiff's counsel asked that if such hypothetical individual required an alternate standing and walking for a period of two hours and the ability to lie down for thirty minutes before resuming the alternate standing and sitting, would the hypothetical person be capable of performing competitive employment. (Tr. 72) The VE indicated that such hypothetical person would be precluded from competitive employment.

## VI. __The ALJ's Decision__

In a decision dated December1, 2017, the ALJ determined that Plaintiff was not disabled under the Social Security Act. (Tr. 11-22) The ALJ determined that Plaintiff had severe impairments of bipolar disorder, ADHD, bilateral osteoarthritis of the feet with bilateral plantar fasciitis and heel spurs, lumbar degenerative disc disease, and obesity. (Tr. 13-16) The ALJ determined that Plaintiff had a RFC to perform light work with the following modifications: (1) she can stand, walk, and sit for six out of eight hours in an eight-hour workday; (2) she can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; (3) she can occasionally stoop and crouch but never crawl or kneel; (4) she must avoid work about shoulder level with her right upper extremity; (5) she is limited to simple and/or repetitive tasks with no close interaction with the public; and (6) she cannot do any jobs requiring ambulating on unimproved terrain or exposing her to whole body vibration. (Tr. 16) The ALJ also found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record…." (Tr. 17) Regarding Plaintiff's mental impairments, the ALJ found that Plaintiff "has had mental health issues since the alleged onset date, including two episodes of decompensation. However, her issues appear to be due primarily to family issues, including difficulties with her son and related marital problems with her husband." (Tr. 18)

The ALJ specifically considered Dr. Sturm's opinions in his medical source statement. The ALJ gave those opinions little weight because of the longitudinal relationship between doctor and patient, noting that Dr. Sturm was a new doctor who had treated Plaintiff for a couple of months. The ALJ also found that Dr. Sturm's opinions were inconsistent with his own treatment notes and the objective record as a whole. (Tr. 18) The ALJ also specifically considered Dr. Mattingly's medical source statement, addressing Plaintiff's mental impairments. Dr. Mattingly found Plaintiff's mental abilities and aptitudes to do unskilled work to be seriously limited. The ALJ gave his opinions partial weight because he did not consider her unable to meet the standards for competitive employment. (Tr. 20)

The ALJ found Plaintiff was unable to perform any of her past relevant work as a school bus driver. The ALJ proceeded to step 5 and found, based on VE's testimony, that there are other jobs existing in the national economy she was able to perform the requirements of representative occupations such as a marketing clerk and a photo copy machine operator. Based on hypothetical questions posed to the VE, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act because someone with her age, education and functional limitations could perform other work that existed in substantial numbers in the national economy. (Tr. 21)

The ALJ's decision is discussed in greater detail below in the context of the issues Plaintiff has raised in this matter.

VII.    **Standard of Review and Legal Framework**

"To be eligible for … benefits, [Plaintiff] must prove that [he] is disabled …." Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A plaintiff will be found to have a disability "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled….  The ALJ consider[s] whether:  (1) the claimant was employed; (2) [he] was severely impaired; (3) [her] impairment was, or was comparable to, a listed impairment; (4) [he] could perform past relevant work; and if not, (5) whether [he] could perform any other kind of work."  Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)).  See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole.  See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a

decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

**VIII.    Analysis of Issues Presented**

In her brief to this Court, Plaintiff raises five related issues.  First, Plaintiff argues that the ALJ erred by giving partial weight to the opinions of Dr. Mattingly regarding her mental impairments.  Plaintiff also challenges the ALJ's evaluation of her subjective complaints. Plaintiff next argues that the ALJ erred by not finding her migraine headaches to be a severe impairment.  Next, Plaintiff challenges the ALJ's determination that Plaintiff retained the RFC to perform light work.  Lastly, Plaintiff requests that if the Court remands this case for further proceedings, the case be assigned to a different ALJ.  Because the Court finds that remand is not appropriate, it does address Plaintiff's allegations of ALJ bias.

In her Reply brief, Plaintiff raises for the first time an additional argument challenging the weight accorded to Dr. Sturm's opinions in his PMSS.[7]  In his PMSS, Dr. Sturm opined that Plaintiff's "limitations are so extreme that they would render her incapable of competitive employment."  (Tr. 18)  New arguments raised by Plaintiff in her Reply brief, do not have to be considered.  See, e.g., Fay Fish v. United States, 748 F.App'x 91, 92 n.2 (8th Cir. 2019) (reply brief is "too late" to properly raise a new argument); United States v. Morris, 723 F.3d 934, 942 (8th Cir. 2013) (internal quotations and citations omitted) ("[W]e do not generally consider new

---

[7] A review of the ALJ's decision shows that he did not base his exertional findings on Dr. Sturm's PMSS.  The ALJ thoroughly discussed specific medical facts as well as the nonmedical evidence of record, addressed the inconsistency of this evidence when viewed in light of the record as a whole, and assessed Plaintiff's RFC based on the relevant, credible evidence of record.  *Accord* SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996).  Because the RFC is supported by some medical evidence, it will not be disturbed.  See Steed v. Astrue, 524 F.3d 872, 875-76 (8th Cir. 2008) (upholding ALJ's conclusion that claimant could perform light work based on medical evidence showing largely normal objective findings or findings of mild conditions, despite fact that medical evidence was silent regarding work-related restrictions such as length of time she could sit, stand, and walk, and amount of weight she could carry); Thornhill v. Colvin, 2013 WL 3835830, at *12 (E.D. Mo. July 24, 2013) (medical records showing that physical examinations were essentially unremarkable and revealed normal findings constituted medical evidence in support of a finding that claimant could perform medium work).

arguments raised in a reply brief"); <u>Hug v. Am. Traffic Sols., Inc.</u>, 2014 WL 2611832, at *6 n.1

(E.D. Mo. June 11, 2014) (refusing to address new argument raised in reply brief).

### A.     <u>Weight of Medical Opinion Evidence</u>

Plaintiff challenges the weight the ALJ accorded to Dr. Mattingly's opinions in his

MMSS without offering sufficient reason.  The Court disagrees with this characterization of the

ALJ's decision.  It is undisputed that Dr. Mattingly was Plaintiff's treating psychiatrist at all

times relevant.  <u>See</u> 20 C.F.R. § 416.902 (defining "treating source" as a claimant's "own

physician, psychologist, or other medical source who provides [claimant], or has provided

[claimant] with medical treatment or evaluation and who has, or has had, an ongoing relationship

with [claimant].").

The record shows that Dr. Mattingly completed Plaintiff's MMSS[8] on June 12, 2016, the

same time that Plaintiff was receiving inpatient treatment for her suicidal ideations, bipolar

disorder, depression, and situational/family stressors.  In the MMSS, Dr. Mattingly found

Plaintiff to be "seriously limited" in all areas of mental abilities and aptitudes needed to do

unskilled and semiskilled work and "limited but satisfactory" in her ability to carry out short and

simple instructions and to ask simple questions or request assistance.  Dr. Mattingly further noted

that work demands such as speed, precision, deadlines, making decisions, completing tasks, and

being criticized by supervisors would be stressful for Plaintiff.  Dr. Mattingly noted that Plaintiff

---

[8] The undersigned also notes that the MMSS was only a series of check marks to assess the functional limitations of Plaintiff with little or no explanation of the findings, no medical evidence or objective testing in support.  A checklist form and conclusory opinions, even of a treating physician, are of limited evidentiary value.  <u>See</u> <u>Wildman v. Astrue</u>, 596 F.3d 959, 964 (8th Cir. 2010); <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001) ("The checklist format, generally, and incompleteness of the [RFC] assessments limit their evidentiary value.").  Further, the MMSS appears to have been procured by, and submitted to, Plaintiff's counsel.

would be absent from work four days a month.[9]

The ALJ accorded Dr. Mattingly's MMSS partial weight, noting that at the time Dr. Mattingly completed the MMSS, Plaintiff was hospitalized for treatment of bipolar disorder and depression. The ALJ explained that "even when [Plaintiff] was hospitalized for treatment, [Plaintiff's] doctor [Dr. Mattingly] found that, although she was limited, she was able to meet the standards for competitive employment." (Tr. 20) Accordingly, the ALJ discounted, in part, Dr. Mattingly's opinions as inconsistent with his own clinical treatment notes and the overall evidence of record, which documented Plaintiff "has had mental health issues since the alleged onset date, including two episodes of decompensation. However, her issues appear to be due primarily to family issues, including difficulties with her son and related marital problems with her husband." (Tr. 18) The ALJ afforded Dr. Mattingly's opinions partial weight because the severity of the limitations was not consistent with the objective evidence of record, her longitudinal medical history, observations by treating and non-treating sources, non-examining medical source opinions, and her daily activities.

"A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the

---

[9] In support, Plaintiff cites to the FMLA form completed by Dr. Mattingly on February 18, 2015. (Tr. 360-62) The ALJ noted that "[a]lthough [Dr. Mattingly] considered she would be absent from work for four days a month, which would preclude competitive employment, it is not clear from the record why that would be the case under normal circumstances." (Tr. 20) The undersigned notes that when Dr. Mattingly completed the form, he indicated that the probable duration of the condition would be two months, February 1 through April 1, 2015. Thus, Plaintiff is incorrect that the FMLA form supports this limitation in the June 12, 2016, MMSS. Even if the FMLA form supported the limitation of missing four work days, '[t]he mere fact that some evidence may support a conclusion opposite to that reached by the Commissioner," however, "does not allow [the court] to reverse the decision of the ALJ." Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

record." Reece v. Colvin, 834 F.3d 904, 908-09 (8th Cir. 2016) (internal quotations omitted). The longer a plaintiff's health care provider has treated her and the more times, the more weight is given to that provider's opinion. 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i). Likewise, the more knowledge a physician has about the plaintiff's impairments, the more weight is to be given to that physician's medical opinion. Id. at §§ 404.1527(d)(2)(ii), 416.927(d)(2)(i). The treatment provided and the "kinds and extent of examinations and testing the [physician] performed or ordered from specialists and independent laboratories" are relevant to the weight to be given the treating physician's opinion. Id. "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight … will [be] give[n] that opinion." Id. at §§ 404.1527(d)(4), 416.927(d)(4). "[T]he more consistent an opinion is with the record as a whole, the more weight … will [be] give[n] that opinion." Id. at §§ 404.1527(d)(4), 416.927(d)(4). "Although a treating physician's opinion is usually entitled to great weight, it 'do[es] not automatically control, since the record must be evaluated as a whole.'" Reece, 834 F.3d at 908-09 (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). "A treating physician's own inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions." Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015) (internal quotations omitted). "Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so." Prosch, 201 F.3d at 1013 (citing 20 C.F.R. § 404.1527(d)(2)).

A review of the MMSS shows that it was based on no objective testing and prepared at the time Plaintiff was hospitalized for treatment of bipolar disorder and depression. The time frame Dr. Mattingly completed the MMSS is important because his opinions do not take into account Plaintiff's successful, outpatient TMS treatment between June 13 and July 15, 2016,

during which Plaintiff reported great improvement in her psychological symptoms and 100% improvement of her depression as a result of the TMS treatment. During his treatment, Dr. Mattingly never imposed any mental limitations or functional work restrictions on Plaintiff that he included in the MMSS. (Tr. 717-23) Dr. Mattingly's own treatment notes and mental status examinations do not reflect any of the mental limitations set out in his MMSS. See Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (affirming ALJ's rejection of treating physician's opinions about plaintiff's exertional limitations that "[were] not reflected in any treatment notes or medical records."). Notably, Dr. Mattingly's own treatment records showed situational stressors but consistently unremarkable findings on mental status examinations. Dr. Mattingly's mental status examination findings consistently showed that Plaintiff was active, alert and oriented in person, time and place, had fair judgment/insight, no hallucinations or suicidal or homicidal ideations. In Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010), the Eighth Circuit found no error in the ALJ's decision not to give a treating psychiatrist's opinion that the claimant could not perform various job-related tasks any weight when his mental status examinations consistently noted that he was alert and oriented with normal speech and thought process. See also Wiese v. Astrue, 552 F.3d 728, 730-31 (8th Cir. 2009) (finding that ALJ had not erred in not finding claimant disabled when record included report by claimant's treating psychiatrist that her though processes were logical, sequential, and goal oriented and findings of treating therapist that her intellectual functioning was average and her thought content was logical and relevant).

The ALJ also concluded that the MMSS was inconsistent with the overall evidence of record. Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996) (treating source's opinions assigned less weight when the "opinions have largely been inconsistent and are not fully supported by the

objective medical evidence).  "[O]ther evidence in the record also supports the ALJ's decision

not to accord [Dr. Mattingly's] opinion controlling weight."  Reece, 834 F.3d at 910 (finding

that "Commissioner gave good reasons for discounting" treating doctor's opinion where his

findings were, *inter alia*, "highly inconsistent with the objective medical evidence in the record"

and "other evidence in the record, such as [plaintiff]'s activities of daily living and [another

doctor's] findings, did not support [the treating doctor]'s opinion and supported a much higher

level of functioning than would be expected from someone with the limitations described in the

[treating doctor]'s Medical Source Statement.").  Specifically, the ALJ noted that during

treatment, Plaintiff had normal mental examinations, with no abnormal findings other than

observations of exacerbations related to family conflicts and strife.  The ALJ also noted that the

objective findings of the consultative examination by Dr. David Lipsitz, Ph.D. showed no

evidence of any active psychotic functions, no delusions, hallucinations, or paranoid ideations, or

depersonalization.  Although her affect was flat and her mood depressed, Dr. Lipsitz found that

intellectual functioning appeared to be within the average range with good concentration and no

memory problems.

The undersigned notes that the limitations listed in the MMSS stand alone and were never

mentioned in any physicians' treatment records or supported by any objective testing or

reasoning.  See Anderson, 696 F.3d at 793-94 (holding proper for an ALJ to discount a provider

statement that "contained limitations that 'stand alone,' did not exist in the physician's treating

notes, and were not corroborated through objective medical testing").  Viewing the ALJ's

opinion in light of the record as a whole, substantial evidence supports the ALJ's decision to

assign partial weight to Dr. Mattingly's opinions in the MMSS.  See Cline v. Colvin, 771 F.3d

1098, 1104 (8th Cir. 2014) (finding no error in decision to discount "cursory checklist statement"

that "include[d] significant impairments and limitations that are absent from [provider's] treatment notes and [claimant's] medical records"); Prosch, 201 F.3d at 1013 (internal inconsistency and conflict with other evidence on the record constitute good reasons to assign lesser weight to a treating physician's opinion). In the instant case, the ALJ sufficiently explained his reasons for giving Dr. Mattingly's mental limitations in the MMSS partial weight as inconsistencies between the objective medical evidence and his own treatment notes and mental status examinations. As outlined above, the objective medical evidence does not support the marked mental limitations in Dr. Mattingly's MMSS.

### B. Plaintiff's Subjective Complaints

Plaintiff also challenges the ALJ's evaluation of her subjective complaints, contending that the ALJ failed to provide specific rationale.

For purposes of social security analysis, a symptom is an individual's own description or statement of her physical or mental impairment(s). SSR 16-3p, 2017 WL 518304, at *2 (Soc. Sec. Admin. Oct. 25, 2017 (republished).[10] If a claimant makes statements about the intensity, persistence, and limiting effects of her symptoms, the ALJ must determine whether the statements are consistent with the medical and other evidence of record. Id. at *8.

In evaluating a claimant's subjective complaints, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, effectiveness, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of

---

[10] The Social Security Administration issued this new ruling that eliminates the use of the term "credibility" when evaluating a claimant's subjective statements of symptoms, clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 518304, at *2. The factors to be considered in evaluating a claimant's statements, however, remain the same. See id. at *13 ("Our regulations on evaluating symptoms are unchanged). This ruling applies to the Commissioner's final decisions made on or after March 28, 2016).

medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Finch, 547 F.3d at 925; Polaski v. Heckler, 739 F.2d 1329, 1322 (8th Cir. 1984). While an ALJ must acknowledge and consider the Polaski factors before discounting a claimant's subjective complaints, the ALJ "need to explicitly discuss each Polaski factor." Wildman, 596 F.3d at 968. If the ALJ finds the statements to be inconsistent with the evidence of record, she must make an express determination and detail specific reasons for the weight given the claimant's testimony. SSR 16-3p, 2017 WL 518304, at *10.

Here, the ALJ largely credited Plaintiff's pain-related assertions by restricting her to light work with occasional stooping, crouching, and climbing ramps and stairs; never crawl, kneel; and no jobs requiring ambulating on unimproved terraine or exposing her to whole body vibration. The ALJ addressed the Polaski factors and made specific findings that Plaintiff's claimed symptoms were inconsistent with the record. Because these findings are supported by substantial evidence on the record, the undersigned must defer to the ALJ's determination. Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016).

As it pertains to Plaintiff claim here, Plaintiff cites to the ALJ's finding that Plaintiff's "statements about the intensity, persistence, and limiting effects of her symptoms, … are inconsistent with the evidence of treatment. The claimant alleges debilitating mental and physical illness, but the medical records simply do not support a finding that her symptoms preclude competitive employment." (Tr. 20) The ALJ thoroughly discussed the medical record and explained that the records showed Plaintiff not to be disabled. Although Plaintiff sustained a sternal and rib fracture, within three months she had no tenderness, a normal range of motion, and normal gait. Examinations showed mildly decreased sensation in her feet, mild swelling and

pain in her ankle, and some tenderness in her back and left knee. Likewise, although Plaintiff complained of joint pain and numbness in her feet, examination findings were routinely normal and minimal with mostly conservative treatment. Dr. Sturm's own treatment records showed normal gait and full strength. (Tr. 16-20)

With regard to Plaintiff's mental impairments, the record showed minimal treatment until late 2016 when she was hospitalized and then more regular treatment when Plaintiff underwent the TMS treatment. By the end of TMS treatment, Plaintiff denied any depression or anxiety and also reported completing tasks around the house, socializing with friends and family, and communicating better with her family and improvement in her energy and motivation. Plaintiff continued treatment with Dr. Mattingly every two to three months, and Plaintiff continued to have situational stressors from her family conflicts. Dr. Mattingly's mental examinations consistently showed Plaintiff was AAOX3, with no suicidal or homicidal ideations or hallucinations, and fair judgment/insight.

Plaintiff ignores the rest of the ALJ's opinion where he articulated the factors on which he relied in evaluating the consistency of Plaintiff's subjective complaints including the nature and frequency of her treatment; her ability to work during her period of alleged disability; her activities of daily living, including providing care for her father, playing computer games, doing some housework, and preparing meals; and inconsistencies between the objective medical evidence and her subjective statements.[11] (Tr. 16-20)

---

[11] The ALJ also noted that, although Plaintiff testified that she stopped working for the first school district after having a nervous breakdown, Plaintiff reported being fired from this job during medical treatment. Likewise, after returning to work as a bus driver for another school district, Plaintiff indicated that she quit because she could not handle the work due to her emotional state, but her husband indicated that she was fired.

The ALJ declined to credit Plaintiff's subjective complaints because the evidence as a whole is inconsistent with her subjective complaints. See Schwandt v. Berryhill, 926 F.3d 1004, 1012 (8th Cir. 2019). Substantial evidence on the record as whole supports the ALJ's finding. See Turpin v. Colvin, 750 F.3d 989, 993 (8th Cir. 2014) (deferring to the ALJ's evaluation of claimant's subjective complaints provide that this determination is supported by "good reasons and substantial evidence"). Based on the Court's review of the record, substantial evidence supports the ALJ's finding that Plaintiff's subjective statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical and other evidence of record.

C.    **Plaintiff's Migraines**

Plaintiff argues that the ALJ's finding that her migraine headaches are not a severe impairment is not supported by substantial evidence.

Notably, Plaintiff did not list migraine headaches as a disabling impairment in her application, request for reconsideration, or disability reports. Failure to allege a disabling impairment in an application for disability benefits is a significant factor in determining the severity of an alleged impairment. See, e.g., Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (holding fact that claimant did not allege disabling condition in his application significant, even if evidence of the impairment is later developed). Nor did Plaintiff offer migraine headaches as a basis for disability at her administrative hearing. See, e.g., Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994) (finding it "noteworthy that [the claimant] did not allege a disabling mental impairment in her application for disability benefits, nor did she offer such an impairment as a basis for disability at her hearing") (internal citation omitted). Although the medical record indicates that Plaintiff has a diagnosis of migraine headaches, disability is not

determined merely by the presence of an impairment but by the effect that impairment has upon the individual's ability to perform substantial gainful activity.  See  Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991).  There is no evidence in the record showing that Plaintiff's migraine headaches impaired her ability to perform basic work activities.

To show that an impairment is severe, a claimant must show (1) that she has a medically determinable impairment or combination of impairments, and (2) that impairment significantly limits her physical or mental ability to perform basic work activities, without regard to age, education, or work experience.  See §§ 404.1520(c), 404.1521(a).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  Kirby v. Astrue, 550 F.3d 705, 707 (8th Cir. 2007).  Basic work activities encompass the abilities and aptitudes necessary to perform most jobs.  Included are physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, performing, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work situation.  See 20 C.F.R. §§ 404.1521(b), 416.921(b). Symptoms "will not be found to affect [a claimant's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 404.1529(b).  In addition, only evidence from acceptable medical sources, such as a licensed physician, can establish the existence of a medically determinable impairment.  Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).

The ALJ noted that Plaintiff had been diagnosed with migraine headaches, but that her migraine headaches were controlled with medication.  Turpin v. Colvin, 759 F.3d 989. 993 (8th

Cir. 2014) (impairments controllable by treatment or medication are not considered disabling). There are no objective findings supporting a finding that Plaintiff's migraine headaches were severe.[12] The ALJ also noted that the record evidence did not suggest that this impairment would impose more than minimal work-related limitations.

The record does not contain a medical diagnosis of migraine headaches. The medical record shows that Plaintiff complained only once to Dr. Keller of headaches, but she also reported that the headaches were relieved by relpax. Plaintiff has cited to no medical evidence showing any indication that Plaintiff had significant functional limitations resulting from her migraine headaches. Accordingly, the ALJ's finding that her migraine headaches are not a severe impairment is supported by substantial evidence.

### D. RFC Determination

Plaintiff challenges the ALJ's determination that Plaintiff retained the RFC to perform light work. In particular, Plaintiff contends that there is no medical evidence to support the ALJ's RFC finding that she could stand, walk and sit for six hours out of an eight-hour work day. In support, Plaintiff cites to Dr. Sturm's PMSS.

"[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation and citation omitted). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). Nevertheless, the ALJ is not limited to considering

---

[12] The undersigned notes that Plaintiff did not receive ongoing treatment for this condition for at least twelve months, suggesting that it did not meet the duration requirement of the Social Security Act.

only medical evidence in evaluating a claimant's RFC. Id.; see also Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree.") (emphasis in original). When evaluating the RFC, an ALJ "is not limited to considering medical evidence exclusively;" but may also consider a claimant's daily activities, subjective allegations, and any other evidence of record. Hartmann v. Berryhill, 2018 WL 467737, at *6 (E.D. Mo. Sept. 28, 2018). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox, 495 F.3d at 620; 20 C.F.R. §§ 416.927(e)(2), 416.946. Where an ALJ fails to properly support the RFC with medical evidence, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole. Holmstrom, 270 F.3d at 722.

After seeing Plaintiff five times, during the period from April 26 through August 15, 2017, Dr. Sturm opined in his PMSS that Plaintiff's ability to sit and stand/walk was limited to less than two hours during an eight-hour work day, and Plaintiff would need to shift positions and would need to walk every thirty minutes for fifteen minutes.[13]

Generally, it is for an ALJ to determine the weight to be afforded to the opinions of medical professionals, and "to resolve disagreements among physicians." Cline v. Colvin, 771 F.3d 1098, 1103 (8th Cir. 2014) (quotation omitted). An ALJ may "disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch, 201 F.3d at 1013. See also Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) (holding that an ALJ must give "substantial weight" to a treating

---

[13] The hearing transcript does not reflect that Plaintiff had to take a break during the hour plus hearing to walk around. (Tr. 28-74)

physician but may discount that weight if the opinion is inconsistent with other medical evidence).

As noted by the ALJ, Dr. Sturm did not begin to treat Plaintiff until April 2017, more than two years after her alleged disability onset date and accorded his PMSS little weight. The ALJ properly noted that Dr. Sturm was not a treating physician for a significant portion of the relevant time period. C.F.R. § 1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight[.]").

Moreover, the ALJ found Dr. Sturm's PMSS was inconsistent with his own treatment notes and the record as a whole. The ALJ noted that Dr. Sturm's treatment notes reflected that Plaintiff was improving with treatment and responding well to her medication regimen which enabled her to remain functional. Likewise, none of Plaintiff's treating sources ever found that Plaintiff's functional limitations would render her unable to work, but they recommended that she engage in exercise. During treatment with Dr. Keller, Plaintiff reported starting a progressive daily aerobic exercise program. On December 1, 2015, Plaintiff requested that Dr. Keller complete the necessary paperwork for her new job as a driver. During follow-up treatment after a car accident, Dr. Keller approved Plaintiff for medical clearance. On August 4, 2016, Plaintiff reported feeling well with no complaints, and Dr. Keller directed Plaintiff to begin a progressive daily aerobic exercise program and reduce exposure to stress.

As discussed above, the ALJ found that Plaintiff had the RFC to perform light work and could stand, walk, and sit for six hours in an eight-hour work day. The ALJ did not allow Dr. Sturm's PMSS to control his RFC findings. See Finch 547 F.3d at 937 (finding that, although "[a]n ALJ must not substitute his opinions for those of the physician." "[t]he ALJ may reject the

opinion of any medical expert where it is inconsistent with the record as a whole.") (internal

quotations omitted).  As addressed above, the ALJ properly addressed Plaintiff's subjective

complaints, and in doing so,  conducted a completed and detailed analysis of Plaintiff's medical

record.  The Court finds that the ALJ's RFC determination is consistent with the relevant

evidence of record including the objective medical evidence, the observations of medical

providers, and diagnostic test results, as well as Plaintiff's credible limitations, and the ALJ's

RFC determination is supported by substantial evidence.

## IX. <u>Conclusion</u>

For the foregoing reasons, the Court finds that the ALJ's determination that Plaintiff is not

disabled is supported by substantial evidence on the record as a whole.  <u>See</u> <u>Finch</u>, 547 F.3d at

935.  Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the

available "zone of choice," defined by the record in this case.  <u>See</u> <u>Buckner</u>, 646 F.3d at 556.

For the reasons set forth above, the Commissioner's decision denying benefits is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of September, 2019.